Rich, Judge,
delivered the opinion of the court :
This appeal is from the decision of the Patent Office Board of Appeals, affirming the rejection of claims 8-19 in Sarett’s application serial No. 600,163, filed July 26,1956, entitled “Chemical Compounds and Process for Preparing the Same.”[1]
The invention relates to the oxidizing of primary and secondary alcohols to corresponding carbonyl compounds. In essence, mild oxidizing agents are used, thus preventing oxidation of unsaturated bonds in the alcohol and also preventing oxidation beyond the desired stage. Alkaline medium is used to avoid undesirable side reactions at acid-sensitive portions of alcohol molecules.
With respect to the naming of the alcohols to be oxidized, there are two groups of claims: (1) claims 8-14 which define the process of oxidizing specific complex alcohols using “pyridine-chromium trioxide *1183 complex” as oxidizing agent; and (2) claims 15-19 which define the process of so oxidizing ‘primary and secondary alcohols broadly. In this group the oxidizing agent is defined as in group (1) except for claim 15 in which it is more broadly defined as “a tertiary amine-chromium trioxide complex,” pyridine being a tertiary amine, the tertiary amines being further restricted to “pyridine, lower alkyl substituted pyridines, and benzosubsituted pyridines.” Claims 17-19, dependent on claim 16, specify, respectively, that the alcohol is aliphatic, or a phenanthrene compound, or a cyclopentanopolyhydro-phenanthrene compound.
Claims 8 and 16 are representative of groups (1) and (2) respectively and read (our emphasis):
8. A process for preparing 3-acetoxy-ll,20-diketopregnane which comprises intimately contacting 3-aeetoxy-ll-keto-20-hydroxypregnane with pyridine eh/rominum trioxide complex at a pH m excess of 1.0 and recovering 3-acetoxy-11,20-diketopregnane from the resulting reaction mixture.
16. In the process of oxidizing an alcohol having at least one hydrogen atom attached to the carbon atom bearing the hydroxyl substituent to the corresponding carbonyl compound, the improvement which comprises intimately contacting said alcohol at a pH im excess of 1 with a pyridine-chromium trioxide complex, and recovering the carbonyl compound from the resulting reaction mixture.
The definition of the alcohol in claim 16 means, in plain English (the use of which is often prevented by Patent Office practice), a primary or secondary alcohol.
There are two grounds of rejection: (1) all claims, double patenting over Arth et ah, a commonly-assigned patent in which appellant is one co-inventor; [2] and (2) claims 15-19, indefiniteness in their broad definitions of the alcohols, under 35 U.S.C. 112.[3]
The complexity of issues requires that we outline briefly the disclosure and claims of appellant’s application and of the Arth et al. patent and set the legal problem in its factual background.

Appellant's Disclosure

Appellant asserts as his broad invention the oxidizing of primary and secondary alcohols, particularly unsaturated alcholols, in alkaline medium with organic base-chromium trioxide complexes. Preferred bases are pyridine, gamma-picoline, beta-picoline, lutidines, quino-line, diethyl formamide and the like. Oxidation is effected by in *1184 timately contacting the alcohol with oxidizing agent in inert solvent. Primary alcohols are oxidized to aldehydes, secondary alcohols to ketones. The specification includes many types of alcohols to which the process is applicable. Over sixty types are disclosed including aliphatic, aralkyl, aralkenyl, aralkinyl alcohols, to name a few, as well as steroid alcohols and 'steroid derivatives such as pregnanes, cholanes, etc.
Appellant says his process is especially useful in oxidizing certain hydroxy ( — OH) functional groups on steroids to their corresponding keto (=0) groups. For example, 17-position hydroxys may be oxidized to 17-ketos without affecting unsaturated bonds elsewhere in the molecule. The specification includes thirtymne specific examples in which alcohols ranging from cyclopentanopolyhydrophe-nanthrene derivatives to n-butyl alcohol (allowed claim Y) are oxidized. Included are pregnanes, ergosterols, phenanthrenes, pyrans, benzyl alcohols, propene alcohols, etc.
Claims 8-14, defining appellant’s process, set forth specific complex alcohols as follows:[4] claim 8 — 3-acetoxy-ll-keto-20-hydroxy-pregnane; claim 9 — 3,21-diacetoxy-ll-keto-lY, 20-dihydroxypregnane; •claim 10 — A8(9),22-3-acetoxy-7,ll-dihydroxyergostadiene; claim 11— 4b-methyl-7-ethylenedioxy -1,2,3,4,4a,4b,5,6,Y,8,10a - dodecahydrophe-nanthrene-l,4-diol; claim 12 — 4b-methyl-Y-ethylenedioxy-l,2,3,4,4a,-4b,5,6,7,8,10,10a-dodecahydrophenanthrene-l,4-diol-l-acetate; claim 13 — 4b-methyl-7-ethylenedioxy -1,2,3,4,4a,4b,5,6,Y,8,10,10a - dodecahy-drophenanthrene-l-one-4-ol; claim 14-4b-methyl-7-ethylenedioxy-l,2,3,4,4a,4b,5,6,7,8,10,10a-dodecahydrophenanthrene-l-ol-4-one. In all the aforementioned alcohols, hydroxy groups are oxidized to keto groups in the claimed process.
Claim 16, supra, is the broadest of claims 15-19. It is inclusive of all primary and secondary alcohols. Claim 15 differs from 16 only in its definition of the complex former used in preparing the oxidizing agent. It too, therefore, includes all primary and secondary alcohols.

The 'Arth et al. Patent Disclosure

Although on the double patenting,rejection here involved we .are concerned only with what this patent claims, in order to understand what it does claim and discuss the opposing arguments on this question, it is necessary to give some consideration to the disclosure of the specification, bearing in mind always that the teachings of that specification (inclusive of its claims) are not prior art with reference to appellant’s invention as defined in the claims on appeal, since the *1185 application on appeal and the patent have the same effective filing date. In re Coleman et al., 38 CCPA 1156, 189 F. 2d 976, 90 USPQ 100. We preface this consideration by quoting the Patent .Office position as stated in the solicitor’s brief:
The position of the Patent Office with respect to this ground of rejection is that the instant claims áre directed to essentially the sanie invention as that recited-in any of Arth’s process claims 9, 10, 11, 12 and 16, and that the two groups' of. claims differ only in scope. [Emphasis added.]
Arth et al., as does appellant, disclose-processes for oxidizing specifically 4b-methyl-dodecahydrophenanthrene-l,4'diol-7-one to 1,4,7-triones.[5] In addition, however, Arth et al. teach processes for isomer-izing various triones by alkali treatment'to form stereoisomers, thereof. The claims define both processes and compounds. Only process claims are germane to.the instant appeal, as tha-solicitor has made clear, since appellant claims processes.
"Simply -stated, Arth et al. teach that ”1,4,7:£riones aré made by-oxidizing 1,4-hydroxy compounds in which' the 7-keto position is* protected by a group II, defined as “a substituent convertible to a keto substituent by hydrolysis.” Enol ethers and ketals are such groups; ethylenedioxy is used in all examples (herein “7=dioxy”). Oxidation is effected with an “oxidizing agent,” disclosed examples being metal alkoxides and also the pyñdme-chromium trioxide complex .of appellants claims. That is the source of the legal problem. The 7-dioxy-l,4-hydroxy starting material is intimately contacted with oxidizing agent to effect reaction. ' The product is a mixture of completely oxidized 1,4-dione and partially oxidized l-ol-4-one and l-one-4-ol. The latter two products may be further oxidized to 1,4-dione by repeating the oxidation, process. Hydrolysis removes the 7-dioxy group to give 1,4,7-triones by restoration of the original 0=substituent.
*1186 An alternative process involves acylating either the 1- or 4-hydroxy group prior to oxidation; this results in a stereoisomer of the trione obtained by the process first above described.
The claims of Arth et al. considered relevant to this appeal by the examiner and the solicitor are 9-12 and 16.[6] Such claims, abbreviated in conformance with footnote 5, supra, read (we have italicized the oxidizing agent) :
9. The process for preparing * * * 1,4,7-trione which comprises reacting * * * 7-ethylenedioxy- * * * 1,4-diol with pyridine-chrommum trioaside complete in pyridine, recovering * * * 7-ethylenedioxy- * * * 1,4-dione from the resulting reaction, intimately contacting said dione with an inorganic base, and hydrolyzing the resulting product by heating with an acid.
10. The process for preparing* * * 1,4,7-trione which comprises reacting * * * 7-thylenedioxy- * * * 1,4-diol with pyridine-chromium triocoide complete in pyridine, recovering * * * 7-ethylenedioxy- * * * l-ol-4-one from resulting reaction, hydrolyzing the recovered product by heating with an acid, intimately contacting the hydrolyzed product with chromium trioxide, and reacting the resulting oxidized product with an inorganic base.
11. The process for preparing * * * 1,4,7-trione which comprises reacting a member from the group consisting of 7-enol ether and 7-ketal derivatives of a compound of the formula

with an oxidizing agent, and hydrolyzing the resulting reaction product by heating with an acid.
*1187 12. The process for preparing a compound of the formula:

which comprises reacting * * * 7-ethylenedioxy- * * * 1,4-diol with acetic an-hydride in the presence of pyridine to produce the corresponding 1,4-diol-l-ace-tate, oxidizing a pyridine solution of the resulting acetylated product with pyridine-chromium triowide complex, hydrolyzing the resulting oxidized product with potassium carbonate, reoxidizing the resulting hydrolyzed product with pyridine-chromium trio wide complex in pyridine solution, and hydrolyzing the resulting oxidized product by heating with an acid.
16. The process which comprises reacting a compound from the group consisting of 7-enol ether and 7-ketal derivatives of a compound of the formula

with an oxidizing agent to produce the corresponding derivatives of * * * 1,4,7-trione.
A point to note in connection with the ensuing discussion is that claims 11 and 16 recite “an oxidizing agent” — a broad, functional, generic expression inclusive of cmy oxidizing agent — and that the remaining claims 9,10, and 12 all specify as the oxidizing agent “pyridine-chromium trioxide complex.” Another point to be noted in this connection is that the board relied only on claims 9,10 and 12 in affirming the double patenting rejection.

The Relationship between Appellant’s a/nd the Patentees’ Inventions

The foregoing, as well as consideration of the record and briefs, presents a clear picture of the general situation. Appellant Sarett made an invention relating to the oxidation of primary and secondary alcohols which reside in the oxidizing agent used in the oxidation process, part of his invention or discovery being that the agent functions under alkaline conditions. This invention he claims as a process of “intimately contacting” the alcohol to be oxidized with his agent, which is novel as an oxidizing agent though per se a known material, “at a *1188 pH in excess of 7.0”(alkaline). Following this first oxidation step, oxidation from the intimate contact being presumed, his process as claimed includes the second step of. “recovering” the oxidation product, which appears to be conventional', mere completion of the process to get out the oxidation product, and.no part of what Sarett invented. In short, his “process” is the result of discovering a new use for a known composition of matter, viz., pyridine-chromium trioxide complex. Cf. 35 U.S.C. 100 (b) and 101.
- ■’ Sarett" was working with others, Arth and Poos, for Merck & Co., Inc. (fn. 2, supra), and with them made other process inventions' by-which certain new compotmds were made by new processes including an oxidation step. Sarett’s oxidation invention could he,, and was, used in some, of these new processes to produce new compounds. For example, patent claim 9 is- a process involving the four steps of oxidizing recovering the oxidation product, reacting it with an inorganic Base, and, hydrolyzing with heat and acid. Step oné is applicant’s oxidation invention.
Patent applications were filed, on the same day, back in 1951, by Sarett on his sole invention and by Arth, Poos, and Sarett on their joint inventions and concurrently prosecuted until an application on the joint inventions was allowed and passed to issue, in 1955, while the Sarett application was still meeting with rejection on prior art. For the first time on January 21, 1958, the record discloses, it met with a “double patenting” rejection on the Arth et al. patent and this, six years later, is before us for decision. (Over three and a half years was taken by the appeal to the board and two more by the appeal to Us. This is “normal” and certainly not chargeable against applicant.) Rejection- on art was still relied on before the board but by it was reversed.
Appellant Sarett insists that the joint inventors claimed only their joint inventions in the reference patent, albeit some of the claims indisputably recite Sarett’s oxidation invention as one step in certain claimed processes, and that his oxidation invention as defined in the claims on appeal is not claimed therein.
The Patent Office does not say that there is any claim in the patent which, as written, defines the same invention that Sarett is claiming but argues that nevertheless there is “double patenting” — or would be if the appealed claims were patented.
We will not at this point go into the reasoning of the Patent Office, which in essence asks us to ignore specific process step limitations in the patent claims on the ground that they are “conventional” steps. We i hink it would be well, on policy grounds, first to face squarely a fact which no one has mentioned but which lurks behind the double *1189 patenting rejection, no doubt, and possibly motivates a rejection on a legal ground which is at times exceedingly obscure. Certainly it is in this case.
Sarett’s oxidizing agents are disclosed in the Arth et al. patent. They are even named in some of the claims as used in one step of multi-step processes. That patent having been issued before any patent •claiming the Sarett oxidizing process could possibly issue (the time lapse would have been nearly three years at the'time of final rejection and is now about nine), if the appealed claims are patented, the patent owner,'the common assignee, will have continuing patent rights covering an oxidation process'step disclosed in-the Arth et al. patent and mentioned in some of its claims long after that patent expires. Another fact which seems to have influenced, if not confused, the Patent Office thinking is that the. patent contains claims- (e.g.-, patent claim 16) which dominate the invention of-some of appellant’s claims calling for “an oxidizing agent” broadly, which claims are supported by a disclosure of such agents which includes appellant’s agent.)
N~w if, by any fair interpretation, it can be said that the reference patent clairn~[7] the invention on which Sarett's assign~e i~ here seeking another patent, it could be said that allowance of the appealed clainis~ would be an extension of the thonopoly of tlie Arth `et al. patent beyond its expiration, the prin~ip~l supposed evil prevented by the rule against "double patenting." [8] if the patent does `not claim the invention, then we would have the not unusual situation in which, when a patent expires, something disclosed in it happens to be covered by the elaims of another patent in common ownership and thus would have `no `e~vte'hsio'n of a patent i~nop6ly, &it metely a legal continuing moi~opoly. The exi~ei'icies of. prosecution commoiily' compel the issuance of interrelated applications with overlapping dis~ closures at widely divergent times.
“Double patenting” rejections are a not infrequent cause of patents issuing with claims covering subject matter disclosed in patents issued much earlier[9] and for that reason may do the public a much greater disservice than-the evils they are supposed to. .prevent in that they string out over a longer period the patent protection granted *1190 on related inventions made at tlie same time and also delay tlie disclosure to the public of the technical data contained in related applications growing out of integrated research. On the other hand, no real public injury is likely to result from the issuance of two patents, even on the same invention, at about the same time to a common assignee.[10] If the ultimate results in the instant case are ever regarded by anyone as appalling, it should be remembered what caused the delay — to the public’s misfortune — in the issuance of Sarett’s patent.
We return to a consideration of the specifics of the double patenting rejection, remembering that the question is whether the Sarett invention of the appealed claims is in effect claimed in the issued Arth et al. patent.

Double Patenting Rejection

The board considered all of appellant’s claims to be directed to the same invention claimed in Arth et al. It said (all emphasis ours):
In the present ease we are convinced that claims 8 to 19 are not directed to a different invention from- that claimed in the Arth et al. patent. The essential feature of the process of claims 9,10 and 12 of Arth et al. is the oxidation of the 7-ethylene dioxy-dodecahydrophenanthrene-l,4-diols with pyridine-chromium trioxide complex in pyridine. As the Examiner points out, the alkali treatment and the removal of the 7-ethylene dioxide [dioxy] protective group involve merely conventional prodedures in this art. It would be expeected, indeed, that the dione products of the Arth et al. claims would be subjected to such a treatment. A chemist of ordinary skill in this art would be aware from the Arth et al. claims of the general oxidation applications of the pyridine-chromium trioxide agent employed in a pH-in-excess of 7.0, including the applications called for in claims 8 to 19.
Claims 8 to 14 call for the oxidation of hydroxy groups on various dodecahy-drophenanthrene and cyclopentanophenanthrene derivatives but in each ease the oxidation reaction is of essentially the same character as that of the Arth et al. patent claims. Each involves the oxidation of one oxidation-susceptible hydroxy group without eliminating a double bond in the nucleus or without disturbing groups which might have been oxidation-susceptible in acidic, media. In the process of appellant’s claims 18 and 19 the oxidation called for may involve any or every compound having, respectively, a phenanthrene and a eyelopentano-phenanthrene nucleus and, therefore, may involve compounds having substitu-ents or unsaturation of the type called for in the claims of Arth et al. as well as compounds presenting no oxidation problems.
The generic claims 15 to 11 represent an extrapolation of the oxidation process of the Arth et al. claims to all alcohols or all aliphatic alcohols since it would be apparent from the patent that the chromium trioxide — pyridine oxidation claimed as useful in the oxidation of the patent claims, would be useful in a wide variety of oxidation processes where no particular problem of protecting oxygen-susceptible radicals or bonds exists.
*1191 Appellant argues that the board erred in considering Arth et al.’s claimed process to be essentially oxidation followed by “conventional” separation steps; that alkaline treatment effects isomerization which is “non-conventional”; and that appellant’s claims are “generic” to those of Arth et al. and patentable under the rationale of In re Stanley et al., 41 CCPA 956, 214 F. 2d 151, 102 USPQ 234. Further, appellant points out that the parent applications of both Arth et al. and his instant application were filed on the same day; that the claims under appeal could not have been asserted by Arth et al. since the latter’s disclosure provided no basis therefor; and that in fact appellant is the inventor of the “generic” invention while the co-inventors in Arth et al. are the inventors of the more narrow invention claimed therein.
No simple relationship exists between the claims of Arth et al. and appellant’s claims. Some of appellant’s claims are more specific, some more generic to those of Arth et al. Some are hybrid. We must therefore look at each claim and analyze it on its own merits.
We can, of course, read the claims in the light of the specifications which support them. In re Simmons, 50 CCPA 990, 312 F. 2d 821, 136 USPQ 450. We do this in order to determine what invention is defined by a claim. Having done that, what remains to be decided with respect to each claim of the application is whether it defines an invention which is patentably distinct from any claim of the issued patent. In re Stanley, et al., supra.
Our analysis of both the Arth et al. disclosure and appellant’s convinces us that the board manifestly erred in rejecting claims 8-10 and 15-19. The former relate to the oxidation of three specific cycZo^enirmopolyhydrophenanthrenes, none of which is disclosed by Arth et al., let alone claimed. The mere fact that the oxidation of cyclopentanopolyhydrophenanthrenes, as stated by the board, “is of essentially the same character as that of the Arth et al. patent claims” is not controlling. In our view, phenanthrenes, which Arth et al. disclose, and cyclopentanopolyhydrophenanthrenes, which they do not, are distinct classes of compounds and so are the compounds resulting from their oxidation. There is no reference of record on which to rest the view that they are not. We therefore consider claims 8-10 to be patentably distinct from any claim in Arth et al. since no claim in that patent is directed to the oxidation of cyelopentanopolyhydro-phenanthrenes, subject matter undisclosed in the patent.
As to claims 15-19, they are generic relative to the Arth et al. claims in their definitions of the classes of alcohols oxidized. Certainly a claim to the genus so defined is not directed to the same subject matter as a claim to the species and we hold claims 15-19 to ‘be “patentably distinct” from any Arth et al. claims. Claims 17 and 19, *1192 furthermore, define classes of alcohols (subgeneric relative to claims 15 and 16) not even disclosed by Arth et al. and, a fortiori, are patent-ably distinct from the claims therein. Thus claims 15-19 are all deemed to define inventions distinct from any inventions defined in the claims of Arth et al. and to be patentable thereover.
We cannot agree with the board’s reasoning because, instead of considering whether the claims of the patent are directed to the ■subject matter of the appealed claims, it treats the patent claims like a prior art reference and says, in effect, a chemist reading those claims would be aware that the pyridine-chromium complex used under alkaline conditions, referred to in the claims, would have “general oxidation applications,” including those specifically claimed by appellant and also as claimed genetically by .appellant. We are not here concerned with what one skilled in the art would be aware from reading the claims but with what inventions the claims define.
It remains to consider appellant’s claims 11-14.

Glaim 11

Claim 11 defines the process whereby 7-dioxy-l,4-diol is oxidized with pyridine-chromium trioxid'e complex at pH' in excess of 7.0 to produce á mixture of 1,4-dione, l-one-4-ol, and l-ol-4-one, thé three products being recovered from the reaction mixture.
The board’s view appears to have been that Arth et al. really claim the same invention in any one of claims 9,10, and 12. Of these claim 9 is, according to the solicitor, the most' similar[11] so we shall discuss it. The Patent Office regards it as “representative of these claims and in effect says if we disagree as to claim 9 it is unnecessary to consider 10 and 12. •
Arth et al. claim 9, which we have set forth earlier, defines a four-step process including not only oxidation and recovery, as in appealed claim 11, but two other steps: (1) treatment of recovered 1,4-dione with inorganic base and (2) hydrolyzing the resulting recovered product by heating with acid. The latter step in fact removes the 7-ethylene-dioxy protective group, as appellant admits.
' The board’s idea, shown by the above quotation from its opinion, was that the “essential feature” of patent claim 9 is the oxidation with appellant’s oxidizing agent and that steps (1) and (2) “involve merely conventional procedures” which one of ordinary skill in this art would expect to be applied to the dione product of the oxidation step. By this thinking the board reduces the patent claim to a two-step process and thus equates it with appealed claim 11, both processes being equivalent. We find the reasoning unsound for various reasons.
*1193 Appellant points out that the inorganic base treatment in the patent claim is to effect isomerization which is not conventional and also that the use of hydrolysis step (2) is not “conventional” in the process of the claim since one might desire to leave the protective ethylenedioxy group on the phenanthrene nucleus, citing an instance of where this is done in the art. The board, as we have pointed out before, cites nothing to show what is “conventional.”
As to the conventionality of step (1), we do not agree with the board. Although it is not quite clear from the Arth et al. disclosure when alkali alumina (inorganic base) treatment is used for isomerization and when it is used simply as a recovery technique, it is clear that 1.4-dione per se is not treated with alumina except to effect isomerization. Furthermore, claim 9 of Arth et al. requires that 1,4-dione first be recovered and only thereafter is it intimately “contacted” (i.e., allowed to react) with inorganic base. Clearly this is not for the purpose of separating 1,4-dione from anything, i.e., for recovery, and must be for isomerization. On this record we cannot equate the inorganic base treatment step of claim 9 of the patent with the recovery step of appealed claim 11 so as to make it “conventional” on the assumption that “recovery” is conventional. Claim 11, in our opinion, is patent-ably distinguishable from claim 9 of Arth et al. and not reject able on that claim.
Contrary to the board, which relied on Arth et al. claims 9,10, and 12, the solicitor has placed principal reliance on their claim 16, which would seem to show a hesistancy to rely on the board’s reasoning, considering also that the board did not even mention claim 16 (or claim 11, the solicitor’s second line of defense).
Claim 16 differs from appealed claim 11, first, in its definition of the alcohol to be oxidized. Claim 11 specifies (see fn. 5) 7-dioxy-1.4-diol which is included within claim 16 in the term “7-ketal derivatives”; but claim 16 also includes “7-enol ether” derivatives. Next, the oxidation products are specified in claim 11 to be three named compounds; in claim 16 they are broadly defined as derivatives of 1,4,7-trione, inclusive of the three but any one or more would be within the claim. Claim 16 is a single step process claim to “reacting * * * to produce.” Claim 11 is a two-step process to “preparing” by “contacting” and “recovering.” Perhaps the differences above recited are only such differences in scope as not to avoid “double patenting” but we do not have to decide that question because of another major difference between the claims in defining the oxidizing agent used in the process.
Arth et al. claim 16 calls for “an oxidizing agent” rather than for the specific agent of claim 11, “pyridine-chromium trioxide complex at a pH in excess of 7.0.”
*1194 The situation is that the oxidizing agent used in the process is claimed generically[12] in the patent in the broadest possible terms as “an oxidizing agent” and as specifically as possible in the application at bar by naming a single oxidizing agent — “pyridine-chromium trioxide complex” — “at a pH in excess of 7.0.” Clearly these two claims, to broad genus and narrow species respectively, are patent-ably distinct. The solicitor admits the correctness of this broad genus and narrow species characterization by making it himself. Nevertheless, he flatly contends that “patent claim 16 and instant claim 11 are directed to the same invention.”
The solicitor first argues that “Claim 16 is readable on the single step of oxidizing” the 7-dioxy-l,4-diol of Sarett claim 11, but it is elementary that readability of a claim on the subject matter of another claim (domination) is neither determinative of the double patenting issue nor demonstrative that claims are directed to the same invention. As Stringham said in his “Double Patenting” many years ago, p. 207:
One of the simplest, clearest, soundest, and most essential principles of patent law, is that a later invention may be validly patented, altho dominated by an earlier patent, whether to the same or to a different inventor.
He also said something else worth remembering anent the issues in this case, p. 209:
The difficulty which American courts, throughout nearly their whole history, have had in understanding the application to patent law of the elementary logic of dominance and subordination, genus and species, goes back to the primitive thought that an “invention” upon which the patent gives protection is something tangible. The physical embodiment or disclosure, which, in itself is something tangible, is confused with the definition or claim to the inventive novelty, and this definition or claim or monopoly, also sometimes called ‘.‘invention” in one of that word’s meanings, is not something tangible, but is an abstraction. Definitions are always abstractions. This primitive confusion of “invention” in the sense of physical embodiment with “invention” in the sense of definition of the patentable amount of novelty, survives to the present day [1933], not only in the courts, but among some of the examiners in the Patent Office.
In patent law there is no possibility of clear thinking until it is understood that an “invention” as protected by a patent is an abstraction, an idea of means. [Our emphasis.]
And on page 228 the same author reiterates:
Springing from the failure to recognize the abstract nature of an “invention” as protected by a patent arises the confusion caused by the words “covered,” “embraced,” and “protected.” The tribunals fail to remember that inventions *1195 like other phenomena fall into genera, and that the genus may be patented. Exactly here lies a mass of judicial and administrative error of perhaps greater magnitude than any other mass of error in the whole field of patent law. No useful thinking can be done on the question of double patenting law, as applied to claims of different scope, until this confusion about genus and species is removed.
This author’s words are worth heeding. He has devoted more published thought to “double patenting” problems than any other scholar in the field.
In urging identity of the invention claimed in claims 16 and 11, the solicitor next attempts to rely on the fact that “Arth [et al.] discloses the use of that specific oxidizing agent,” meaning appellant’s agent. But the patent also discloses a whole class of other oxidizing agents — metal alkoxides — and appellant’s pyridine-chromium trioxide complex is disclosed as a possible alternative to their use. Here the solicitor is falling into the very fault of reasoning pointed out by Stringham a quarter century ago, confusing the disclosure with the definition of the claim, or asking us to. The mere inclusion in the supporting disclosure for the generic claim to all oxidizing agents of appellant’s specific oxidizing agent does not convert the generic claim to a claim to the species. Nor, may we add, does the recitation of appellant’s agent as used in one step of some of the patentees’ other four- and five-step process claims. This second argument is, therefore, without weight.
Finally, the solicitor says:
* * * appellants [sic] admit that Arth et al. were the inventors of appellants’ [sic] ocoidation reaction in conjunction with other reaction steps (Br-28), [so] it is evident that patent claim 16 and instant claim 11 are directed to the same invention. [Original emphasis.]
The wrong words have been italicized by the solicitor. The important words from the supposed “admission” are “in conjunction with other reaction steps” and when they are heeded and taken in context there is no “admission” whatsoever. There is such a transparent effort to turn a plain statement into something it is not that we deem it desirable to show what appellant’s brief actually said: ' ■
Likewise here as in Stanley et al. appellant stresses that he is the inventor of the generic oxidation reaction, which therefore could not have been claimed by Arth et al. Arth et al. were the inventors of the specific “improvement” claimed in their patent comprising the process of producing the novel triketo compounds of their invention by successive stages of reaction applied to a specific starting material, including appellant’s oxidation reaction in conjunction with other reaction steps.
We think this speaks for itself, that the “admission” relied on, to be charitable, is the nonexistent product of an overwrought imagination and we therefore find no support in this argument for the con *1196 tention that the claims are for the same invention. We will not sustain the rejection of claim 11 on the ground of “double patenting.”

Claims 12, IS, and lip

Claim 12 defines the two-step process of (1) oxidizing 1,4-di oil-acetate with pyridine-chromium trioxide complex at pH in excess of 7.0 to produce l-ol-4-one-l-acetate and (2) recovering it.
Claims 13 and 14 define, respectively, the oxidation, with the same oxidizing agent as in claim 12, of 7-dioxy-l-one-4-ol and 7-dioxy-l-ol-4-one to produce the corresponding 1,4-dione and the recovery thereof.
The Patent Office makes the same argument based on Arth et al. claim 16 (and secondarily claim 11) as to these claims which it made on appealed claim 11 without distinguishing between them. We reject that argument for the reasons we have stated.
As to Arth et al. claims 9,10, and 12 on which the board chose to rely, the solicitor rested his case on patent claim 9 saying that if the court held against him as to that claim he thought it “highly unlikely that it would fail to find a patentable distinction between the instant claims and patent claims 10 and 12.” We give the prophet his due but in doing so we state it to be our opinion that patent claim 12 is the most relevant to appealed claim 12 and patent claim 10 is the most relevant to appealed claims 13 and 14. However, each of the appealed claims defines an oxidation with Sarett’s specific oxidizing agent followed by a conventional “recovery” of any desired and undefined kind. Patent claims 10 and 12 by contrast define five-step processes involving isomerization of one of the recovered products as in the case of claim 11, fully discussed above. We find in these facts more than enough to convince us that “patentable distinction” exists.
We therefore reverse all rejections predicated on “double patenting.”

Indefmteness Rejection

The examiner said in his answer [all emphasis ours] :
These latter claims [15-19] are so broad as to be indefinite in the use of the indefinite articles “an” and “a” to define the alcohol reactants. Admittedly, the disclosure of operative schools [alcohols] is broad, however, interfering oxidation sensitive groups such as sulfides, sulfoxides, olefinic, acetylenic, cyano, carbamyl, and isocyanate are not shown to he operative in the herein claimed process. All of these groups are oxidation sensitive and may be preferably oxidized instead of the alcohol groups, and thus rendering the process inoperative. [Oases cited.]
The board said [all emphasis ours] :
The Examiner rules that claims 15 to 19 are indefinite because of the articles “a” and “an” employed to characterize the alcohol oxidized. We understand *1197 this to he a rejection based on the claims’ failure to comply with the requirements of 35 U.S.O, 112 because they do not definitely delineate the groups of alcohols to which the claimed process is applicable. Appellant’s process is described as being in the oxidation of OH radicals in certain types of compounds — particularly the alcohols having acid-sensitive substituents or unsaturated bonds which cannot be oxidized under acidic conditions. We find, though, no indication in the claims of the alcohols, to which the process is applicable or for which it has particular advantages. Undoubtedly, the process has advantages for numerous alcohols. Undoubtedly, also, there are alcoholic compounds, bearing competitively reactive groups, with which the pyridine-complex might produce some results but not the • oxidation advantages in the production of the corresponding carbonyl compound on which appellant predicates patentability.
* ⅜ ■* * ' * * *
We agree with the Examiner that claims 15 to 19 are not definite as to the alcohol compound oxidized. Appellant’s specification contributes to the indefiniteness of the compounds by indicating * * » that the “primary and secondary alcohols reduced [oxidized] by the methods of the present invention' can be unsubstituted alcohols or alcohols containing- substituents such as halo, amino, nitro carbonyl, sulfonic acid groups and the like”. This redefinition not only distorts the meaning of the term “alcohol” * * * but also leaves in doubt what other radicals are 'included in the term “and the like”. '
On reconsideration the board added: ‘
Appellant’s claims 15 to 19, however, do not exclude any substituents on the alcohol radical which may be considered the “like” of “substituents such as halo, amino, nitro carbonyl sulfonic acid groups ⅜ ⅝ ⅜” and appellant’s specification includes polyhydrie alcohols among the materials that he may oxidize so that the term “alcohol” is not interpreted as being a “monohydrié alcohol.” It is doubtful whether the claims exclude compounds with a tertiary alcohol group in addition to a primary or secondary alcohol group.
Apparently the board had in mind two separate bases of rejection under 35 U.S.C. 112: indefiniteness, in that appellant “distorts' the meaning of” or redefines the term “alcohol”; and undue breadth, in that appellant fails to set out the specific classes of alcohols to which his process is applicable.
As we view appellant’s disclosure and claims, the invention is a broad one, wherein primary and secondary alcohols generally are oxidized at the hydroxy group. Use of a mild oxidizing agent in alkaline medium prevents interference with unsaturated bonds or acid-sensitive groups elsewhere in the alcohol molecule. The process is in no way limited to oxidation of alcohols having such bonds or groups but is particularly applicable thereto. Neither the examiner nor the board seems to disagree with this, the examiner saying that “ the disclosure of operative alcohols is broad” but refusing, nevertheless, to allow commensur'ately broad claims because appellant has not. shown that certain easily oxidizable groups not excluded by the claims are “operative.” Similarly, the board acknowledges that the “process has advan *1198 tages for numerous alcohols” but nevertheless sustains the:examiner.
Appellant argues that disclosure of over sixty operative classes of alcohols, and thirty-one specific examples, is ample basis to support broad claims; that neither the examiner nor the board support their skepticism about operability with specific inoperative examples; and that appellant does not distort the definition of “alcohol.”
' We agree with appellant. With respect to redefining “alcohol,” appellant’s brief states:
There are three classes of alcohols: primary, secondary and tertiary. Primary alcohols are characterized by the fact that the carbon atom bearing the hydroxyl substituent is also attached to two hydrogen atoms. In secondary alcohols this carbon atom is attached to only one hydrogen atom. In tertiary alcohols there are no hydrogen atoms attached to the carbon atom bearing the hydroxyl sub-stituent. Obviously then appellant’s definition of primary and secondary alcohols as “having at least one hydrogen atom attached to the carbon atom bearing the hydroxyl substituent” does not distort the definition of primary and secondary alcohols in any way.
Appellant’s contention [is] that the alcohols which may be oxidized by the process of his invention can be substituted or unsubstituted and similarly does not distort any definition of alcohols acceptable to those skilled in the art. “Unsubstituted” means that the hydrogen atoms attached to the carbon atom of the alcohol molecule are not replaced with other functional groups. “Substituted” means that at least one hydrogen atom is replaced with a functional group. Butanol is an unsubstituted alcohol, whereas 3-chlorobutanol is a substituted alcohol. This is the accepted meaning of these terms in the art.
As we said at the beginning, in appellant’s claims, the phrase “an alcohol having at least one hydrogen atom attached to the carbon atoms bearing the hydroxyl substituent” means primary and secondary alcohols.[13] The specification states that such alcohols may be “substituted” and may be “polyhydric.” We see nothing unconventional about such terminology.[14] Thus the claims are not indefinite.
As to the undue breadth rejection, appellant’s brief states [emphasis ours] :
We note further that R. Macy in “Organic Chemistry Simplified,” Chemical Publishing Co., 1943, in defining alcohols, at p. 79, states “The hydroxy (OH) groups attached to the carbon chain are called alcohols. The compound described in the preceding section [CH3CHOHCHCH3CHCICHECH3] is therefore known to the organic chemist as 3-methyl,4-ehlorohexanol-2 * * *.” We note *1199 that even in defining alcohol, the author uses as an example a substituted alcohol.
“Polyhydric” is conventional terminology, Hackh defining polyhydric alcohols as those with an indeterminate number of hydroxy groups, thus R(OH)*.
Ai>pellant in his specification * * * has amply illustrated both substituted and unsubstituted primary and secondary alcohols which may be oxodized by the process of the invention. The application names over sixty such alcohols to which the invention is applicable * * *.
The alcohols- thus listed include both primary and secondary monohydroxy alcohols, polyhydroxy alcohols, saturated and unsaturated alcohols, aralkyl alcohols, including those in which the aryl group is substituted with nitro, hydroxy and alkoxy groups, alieyclic alcohols, polycyclic alcohols, heterocyclic alcohols, terpine alcohols and steroid alcohols, including those in which the alcohol group is attached directly to the eyclopentanophenanthrene ring and those in which it is attached to a side chain on the ring.
In addition to the above, appellant concludes his specification with thirty-one speoiflo examples * * * illustrating the application of his novel method to different primary and secondary alcohols. These include simple primary alkanols such as n-butyl alcohol and also more complex polyfunetional primary and secondary alcohols including pregnane derivatives, sex hormones, phenan-threne compounds, substituted and unsubstituted heterocyclic alcohols, bile acid derivatives, aralkenols and substituted and unsubstituted aralkanols.
We believe appellant’s claims are supported by the specification. Broad inventions can be defined only by broad claims. In re Sus et al.,49 CCPA 1301, 306 F. 2d 494, 134 USPQ 301. As stated by this court in In re Cavallito et al., 48 CCPA 711, 282 F. 2d 357, 127 USPQ 202,
The question whether a broad claim to an invention in the field of chemistry is sufficiently supported by the compounds named and examples given in an application has been frequently considered by this court. As was said in In re Shokal et al., 44 CCPA 854, 242 P. 2d 771, 113 USPQ 283:
The decisions do not however fix any definite number of species which will establish completion of a generic invention and it seems evident therefrom that such number will vary, depending on the circumstances of particular cases.
The mere fact that a claim covers a large, or even an unlimited number o£ products, does not necessarily establish that it is too broad.
We consider the disclosure here of over sixty classes of alcohols and thirty-one specific examples of diverse alcohol types to be adequate basis for appellant’s claims.
Both the examiner and the solocitor list various oxidizable sub-stituents including sulfide, sulfoxide, olefinic, acetylenic, etc., which they say if present on an alcohol may render the claimed process “inoperable.” We see no basis for such conclusion. Even if such substituents be present, it does not follow that the hydroxy group will not be oxidized, which is all the claims require.
In any event, the mere possibility of inclusion of inoperative substances does not prevent allowance of broad claims. The board *1200 has so held in Ex parte Lilienfeld, 44 USPQ, 174, Ex parte Pechukas, 94 USPQ 390, and Ex parte Friedman, 136 USPQ 381, all cited by appellant. If they are so broad as to be vulnerable, no one but the patentee will suffer from it.
It is certainly not incumbent on an applicant who has made a broad process invention and supported it by an adequately broad disclosure to demonstrate the operativeness of every substance falling within the scope of the broad claims to which he is entitled. In the instant case the research to do this would quite evidently be endless. The function of claims is to point out the invention and de-fine the scope of the monopoly, not to exclude substances which are possibly of no use in practicing the invention.
We do not consider the claims unduly broad and reverse the indefiniteness rejection.
The decision of the board is reversed. ■
Worley, C. J., concurs in result.

 Tbis application Is a contlnuatlon-ln-part of applications serial No. 263,016 and 292,985, filed December 22,1951, and June 11,1952, respectively.
December 22, 1951, is also the filing date of the parent application serial No. 263,015 of the application which resulted in the Arth et al. Patent No., 2,722,532 Issued to the assignee of the present application, which patent Is the only reference now relied on in rejecting the appealed; claims.

 Patent No. 2,722,532, Issued Nov. 1, 1955, to Glen. E. Arth, George I. Poos, and Lewis H. Sarett (the applicant herein), assignors to Merck & Co., Inc., Rahway, N.J. This patent issued on application serial No. 293,672, filed June 14, 1952, as a continuation-in-part of serial No. 263,015, filed December 22, 1951.

 The board allowed one claim defining the process of oxidizing n-butyl alcohol to n-butyraldehyde with pyridine-chromium trioxide complex at pH greater than 7. Appellant complains that this specific claim is no protection for the broad invention he has disclosed and claims in some of the appealed claims.

 Por structural formulae and conventional numbering of steroid nucleii, see Handbook of Chemistry and Physics, 44th Ed. (19G2-3), pp. 1946-1971.

 Such names are too cumbersome for discussion, 4b-methyl-dodecahydrophenanthrene-1,4,7-trione is represented structurally, as shown in the patent, thus:

Hereinafter in this opinio^ to simplify discussion, such molecule will be referred to simply by variations at the 1, 4, and 7 positions, omitting the long name of the basic 3-ring structure, e.g., 1,4,7-trione as above, or 7-ethylene-dioxy-l-ol-4-one, etc. Also 7-ethylene-dioxy will be simply “7-dioxy.” (The term “-one” refers, of course, to =0 and “-ol” designates OH, oxidation transforming the latter into the former by removal of a hydrogen atom.)

 The Patent Office position as to which claims of the Arth et al. patent support the “double patenting” rejection has been one of vacillation., The examiner’s final rejection relied on claims 9 and 10 only. After reading the brief on appeal to the board, he cited in his Answer thereto claims 9, 10, 11, and. 16. The Board of Appeals referred only to claims 9, 10, and 12, ignoring claims 11 and 16, possibly for what it considered good reason. The solicitor’s brief in this court places primary emphasis — Indeed suggests we may decide the case — (on claim 16 alone, with claim 11 as a close follow-up therefor, these claims being similar; in arguing claim 9, new theories supported by four new references to literature are presented. As to claims 10 and 12, the brief says “consideration of the propriety, of these claims of Arth [et al.], as a basis for the double patenting rejection is deemed unnecessary,” adding that “if the Court finds that the instant claims are patentably distinct from the broader patent claims 9, 11 or 16, it is highly unlikely that it would fail to find a patentable distinction between the instant claims and patent claims 10 and 12.”

 Idt should be clear that the patent could not legally contain a; claim to Sarett’s sole Invention under existing law because it would not have.been the invention of the joint patentees; This rule of law forces the filing of distinct applications in many situations resembling that before us and creates complexities and delays which could be avoided, under a less rigid statute. Cf. 35 U.S.C. 111, 116, and 256. .

 A wide variety of fact situations appear in cases which have been lumped under the “double patenting” heading. We do not recall a case, and none has been cited, involving facts on all fours-with those here but similar situations are opt at all uncommon.

 See, for example, the fact situations in the numerous cases discussed in this court’s opinion in In re Stanley et al., 41 CCPA 956, 214 F. 2d 151, 102 USPQ 234, especially those in which double patenting rejections were reversed.

 We are not unaware of the potential divided ownership argument but we think that, realistically, it lacks substance.

 Cf. fn. 6, supra.

 Commissioner Paine correctly said in Ex parte Ewart, 1880 CD 78 :
“The term ‘generic,’ in its application to inventions, has not an absolute but only a relative signification. An invention which is generic in its relation to a class oí inventions which it embraces as species may itself be specific in its relation to a broader class in which it is included.”

 Hackh’s Chemical Dictionary, 3d Ed., supports us. The presence of other -OH groups, rendering the alcohol polyhydric, does not make the alcohol any less “primary” or “secondary.” Further, contrary -to the board, we consider it immaterial that appellant’s claimed alcohols include those containing a tertiary alcohol group.

 In fact, The Condensed Chemical Dictionary, 4th Ed., p. 21, in defining “alcohol” states, inter alia, “In general the ending -ol in the name of an organic compound signifies the presence of an, OH radical, and alcoholic properties are to be expected, although they may he markedly modified by other elements present in the molecule[Emphasis ours.] Thus to suggest that substitution of alcohols by other elements renders the compound no longer an alcohol would seem erroneous.