56 CCPA
**Application of Myron J. JURSICH and Gail T. Randich.**

**Patent Appeal No. 8121.**

United States Court of Customs and Patent Appeals.

May 22, 1969.

Herbert B. Keil, Marzall, Johnston, Cook & Root, Chicago, Ill., attorneys of record, for appellants.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Lutrelle F. Parker, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND and BALDWIN, Judges.

WORLEY, Chief Judge.

The issues here are whether the Board of Appeals committed reversible error in sustaining the examiner's rejection of claims 1–5 [1] as unpatentable over British patent 883,973 under 35 U.S.C. § 103, and on the ground of double patenting in view of the claims of Stephenson patent 3,256,141 [2] considered with Australian patent 163,501.

The invention is reflected in claim 1:

1. A method of *improving the retention of filler and fiber fines in the processing of paper* which comprises the step of adding to an aqueous paper pulp suspension at least a retention improving dosage of an organic water-soluble *terpolymer* formed as the reaction product of 85.0–95.0 parts by weight of acrylamide, 0.3–2.0 parts by weight of a polymerizable polycarboxylic acid selected from the group consisting of maleic acid, maleic anhydride and fumaric acid and 3–15 parts by weight of an ethylenically unsaturated water-soluble monomer. [Emphasis supplied.]

The "ethylenically unsaturated water-soluble monomer" employed by appellants may be acrylic or methacrylic acid, and salts and alkyl esters thereof, vinyl acetate, or acrylonitrile. In claim 5, the terpolymer is defined as the "reaction product of 89.5–94.5 parts by weight of acrylamide, 0.5–1.5 parts by weight of maleic anhydride and 5–9 parts by weight of methacrylic acid." When appellant flows his aqueous pulp suspension containing pulp, filler pigment and terpolymer retention aid onto the travelling screen or cylinder of the conventional Fourdrinier or cylinder paper making machines, the terpolymer causes more of the filler and fiber fines to be retained on the screen or wire-covered cylinder and less to be lost with the "white water" [3] drained from the screens.

*The Section 103 Rejection*

The British patent discloses a process for retaining pigment fillers on paper fibers when the latter are sheeted on a Fourdrinier screen which comprises the addition of an acrylamide polymer "retention aid" to a slurry of cellulosic fibers containing the filler. According to British:

\* \* \* The polymer is at least *predominantly* composed of carbamoylalkylene linkages \* \* \*. The polymer may be completely composed of carbamoylalkylene linkages as in the case of *polyacrylamide*, polymethacrylamide and ploymerized acrylamide-maleamide mixtures or may be partially (at least about one-half) composed of such linkages, the remainder

---

1. Appearing in serial No. 398,418, filed September 22, 1964, as a continuation-in-part of serial No. 205,495, filed June 27, 1962 and entitled "Polymeric Compositions and Their Use in Paper Making Process."

2. Issued June 14, 1966 on application serial No. 406,868, filed October 27, 1964, as a continuation-in-part of application serial No. 205,879, filed June 28, 1962. Both the Stephenson patent and the present application are assigned to Nalco Chemical Company.

3. Appellants' brief explains:
   In general, there are two types of machines that are used in forming paper. In a Fourdrinier machine, pulp stock containing pulp fibers, filler, sizing, etc., is passed from a head box onto a moving, endless bronze wire screen. Substantial amounts of fiber and filler remain on the screen while most of the water in the pulp stock drains through along with unretained fiber fines and filler. The water that is removed from the pulp is known as white water. \* \*
   The second conventional type of paper forming device is the cylinder machine. In the cylinder machine a wire covered cylinder is rotated in a vat containing dilute paper stock. The paper stock is deposited on the turning screen as the water within the cylinder is removed.

being inert linkages such as those derived from non-ionic vinyl monomers copolymerizable therewith such as *acrylonitrile, vinyl acetate* and *ethyl acrylate.* The foregoing monomers are substantially non-ionic. *Alternatively,* the polymer may contain carboxyalkylene linkages such as are introduced by *acrylic acid, methacrylic acid, maleic acid,* maleamic acid or sulpho groups such as are introduced for example by p-vinyl-benzene-sulphonic acid. These polymers are thus anionic; the proportion of such groups may be up to 50 mol percent. *If desired, inert linkages may also be present.* [Emphasis supplied.]

The examiner viewed the above disclosure as teaching that the polymeric retention aid of British could be a terpolymer composed of predominantly acrylamide, inert linkages derived from acrylonitrile, ethyl acrylate or vinyl acetate, and carboxyalkylene linkages derived from maleic acid—the same components that appellants employ. Realizing that the British patent does not disclose the precise ranges or amounts of terpolymer components set forth in the claims, the examiner nevertheless thought it "would be obvious to one having ordinary skill in the art to determine the limits of proportions in order to obtain the optimum retention of fillers in making paper." The board agreed.

■ With respect to claims 1–4, we find no reversible error in the conclusions of the examiner and board. It seems to us, as it did to the board, that appellants have simply followed the suggestions of British as to the type and amount of terpolymer which should be employed as a retention aid, namely one which contains "predominantly" acrylamide with minor amounts of a monomer providing "carboxyalkylene linkages," such as maleic acid, and a monomer providing "inert linkages," such as vinyl acetate, acrylonitrile or ethyl acrylate.

There is no evidence of record establishing that the broadly defined terpolymers containing the particular amounts of monomer components recited in claim 1, e.g., 3–15 parts by weight of such "ethylenically unsaturated water-soluble monomers" as vinyl acetate, acrylonitrile or ethyl acrylate, provide any different retention result or effectiveness than the terpolymers of British which perhaps include a broader contemplated range of amounts of those monomers.

A different question is presented by claim 5, calling for the use of a terpolymer containing particular amounts of acrylamide, maleic anhydride and methacrylic acid. The board found that, "[s]ince the reference states that either methacrylic acid *or* maleic acid may be added to the acrylamide, we consider that it would be obvious to workers of ordinary skill in the paper-coating art that *both of* these acids could be present, up to a combined limit of 50 mol percent." [Emphasis supplied.] By contrast, the examiner appears to have found no clear suggestion in British of the use of that particular terpolymer as a retention aid, inasmuch as his rejections fail to draw attention to that terpolymer as one disclosed by the reference. We don't think that particular terpolymer containing the claimed proportions of acrylamide, maleic anhydride and methacrylic acid, or the improved filler and fiber fines retention obtained by using it,[4] is clearly suggested to one of ordinary skill in the art by British either, noting, as did the board, that the reference seems to describe the monomers providing the carboxyalkylene linkages in the disjunctive "or," not the conjunctive "and." Like appellants, we see no clear reason why one of ordinary skill would necessarily be led by British to employ in the claimed proportions two different monomers providing carboxyalkylene linkages—one a dicarboxylic acid

4. Appellants present data in their specification which shows that pigment and fiber retention is considerably higher when a terpolymer within the limitations of claim

5 is employed than when a terpolymer outside the claimed monomer ranges is employed.

and the other a monocarboxylic acid—as components of the polymeric retention aid to obtain the improved results appellants do.

The rejection of claims 1–4 under § 103 is *affirmed,* and the rejection of claim 5 under § 103 is *reversed.*

### The Double Patenting Rejection

■ The Stephenson patent, on which the double patenting rejection is predicated, relates to a method for improving the operational efficiency of "white water" recovery systems employed in the manufacture of paper. It appears that the purpose of those recovery or "saveall" systems is to permit economical recovery of the unretained fiber fines and filler pigment appearing in the "white water" of the paper making process and, concomitantly, to prevent pollution of the natural bodies of water into which "white water" is normally discharged. Stephenson describes two known types of saveall systems sought to be improved—*vacuum* systems and *flotation* systems. He improves those recovery systems by adding to the "white water" treated by the system the very same terpolymers appellants add to the aqueous pulp and pigment suspension in

their process, as reflected in Stephenson claim 5:

5. The method of improving the operational efficiency of *vacuum* and *flotation* type [5] white water recovery systems *whereby increased amounts of fibers and solids materials are collected and removed from the white water,* which comprises the step of treating the white water with at least 0.1 p.p.m. based on total white water influent, of an *organic water-soluble terpolymer formed as a reaction product of 89.5–94.5 parts by weight of acrylamide, 0.5–1.5 parts by weight of a polymerizable polycarboxylic acid monomer selected from the group consisting of a maleic acid, maleic anhydride, and fumaric acid, and 5–9 parts by weight of an ethylenically unsaturated water-soluble monomer differing from the above monomers.* [Emphasis supplied.]

The Australian patent is directed to the use of water-soluble acrylamide polymers and acrylamide-acrylonitrile copolymers as (1) an aid in flocculating and removing suspended particles in various industrial waters after their use and prior to disposal, and (2) an aid in the precipitation and retention of size and

5. Although the Stephenson patent disclosure is not available as evidence of prior art against appellants by reason of its later effective filing date, it is, of course, proper to refer to the patent disclosure to ascertain the meaning of expressions employed in the claims. In re Baird, 348 F.2d 974, 52 CCPA 1747 (1965) ; In re Dinwiddie, 347 F.2d 1016, 52 CCPA 1693 (1965). In that regard,

* * * The *vacuum* type system operates on a simple principle. In this system a wire rotary drum having a plurality of foramen is employed and the paper stock as it passes over the wire drum is subjected to a vacuum which deposits the fibers on the wire with the water being pased through for re-use or disposal. In this type of system, the suspended solids of the system are collected on the drum wire and are then removed by scraping, dumping, or the like. Usually a breaker roll is used to contact the wire drum whereupon the vacuum is broken and the fibrous mat is transferred to the roll and subsequently re-used or discarded. * * *

* * * The principle upon which the *flotation* save-all systems operate is that of continuously dissolving air under pressure into a collected quantity of white water. This produces a flotatable mass consisting of fiber and other undissolved components which separate from the furnish used in the particular paper process. After the air has been dissolved under pressure into the white water, the compressed white water is then released to the atmosphere or to a reduced pressure system, usually by passage into a separate container. As a result, air bubbles are formed which carry the fiber and other suspended materials to the surface of the collecting container. After being carried to the surface of the container, the suspended materials which are frequently in the form of a frothy or foamy mass, are then skimmed by means of suitable mechanical skimmers and are then either returned for reprocessing or are discharged to waste. [Emphasis supplied.]

filler on a screen of a paper making machine.

Said the examiner:

\* \* \* The claims of \* \* \* [Stephenson] recite the use of the same terpolymer as recited in the present claims in the environment of flocculating the fibers and solid material present in white water recovery systems in papermaking. One purpose of the above is that the white water may be disposed of by discharge into streams or sewage systems without pollution thereof. The Australian patent discloses the alternative use of water-soluble acrylamide polymers for clarifying industrial water after use prior to disposal into natural water courses and for the retention of fillers in forming filled paper. It would be an obvious expedient to use the terpolymer recited in the claims of \* \* [Stephenson] in the environment of improving filler retention in paper formation since the use of acrylamide polymers in both environments, clarifying industrial water and filler retention, is alternative as evidence by the Australian patent.

The board agreed.

Appellants' principal argument on this phase of the case is that the claims of Stephenson are directed to a flotation type saveall process in which suspended particles are brought to the *surface* of the liquid, whereas Australian clarifies water by coagulation and *settling*. As the solicitor points out, and as is clear from the Stephenson patent claim heretofore reproduced, appellants appear to have overlooked the fact that Stephenson also claims the use of the terpolymers in issue in a *vacuum* type saveall system— a system which bears a striking resemblance in principle of operation to the conventional Fourdrinier and cylinder screen paper making processes. In both types of processes, settling and retention of suspended particles on the wire screen of the apparatus is of importance and, insofar as the record shows, one of

ordinary skill would have no cause to believe that a polymeric material effective to improve retention of pigment and fiber on the screen of a vacuum type save-all system would be ineffective to improve retention of pigment and fiber on a Fourdrinier or cylinder screen of a paper making machine.

While we agree with appellants that they and Stephenson are not claiming the *same* invention, it appears to us that the presently claimed process is but an obvious variation, in the double patenting rather than the § 103 sense, of the process already claimed by Stephenson and, on the present record, is not allowable in view of our prior decisions. See In re Rogers, 394 F.2d 566, 55 CCPA 1092 (1968); In re Cole, 373 F.2d 532, 54 CCPA 1107 (1967).

The record shows that appellants' assignee filed a terminal disclaimer in the Patent Office *after* the board decision which the board refused to consider because it was not timely presented[6] or considered by the examiner. Appellants assign error in that action by the board, arguing that the terminal disclaimer "eliminated the double patenting issue in the present case." However accurate that statement may be, we cannot consider the disclaimer here, although appellants do not appear to be without further recourse. See In re Rogers and authorities cited therein.

The decision is *affirmed*.

*Affirmed.*

BALDWIN, Judge (concurring).

Although I agree with the majority opinion and decision, I feel called upon to comment further in regard to the Patent Office's handling of a terminal disclaimer filed (albeit "not timely" under the existing criteria) in an effort to eliminate an obviousness-type double patenting rejection. Inasmuch as applicants have no *right* under the existing statutes or *present* Rules of Practice to have a terminal disclaimer considered by

---

6. Compare Ex parte Fertig, 155 USPQ 475.

the Board of Appeals *or* the examiner anytime after decision on appeal (or even after a final rejection), I am constrained to say that we cannot consider the matter for the first time, the Patent Office having declined to do so. What I find inexplicable is the failure of the Patent Office administration to provide appropriate procedural mechanisms for the consideration of a terminal disclaimer *at any stage*, as a matter of right, where a legal issue or controversy may be so easily and apparently obviated, thereby conserving judicial manpower. Here, the latter half of the majority opinion deals with an issue which would not even be before us but for the Patent Office's procedural restraints. Indeed, the Patent Office should *encourage* applicants to file terminal disclaimers to obviate obviousness-type double patenting rejections where the applicants are so inclined; it might even serve to reduce the Patent Office backlog about which we are so constantly advised. Moreover, it would be commendable for the Patent Office to join an appellant who should petition this court for remand of a pending appeal to the Patent Office for consideration of a terminal disclaimer filed, or sought to be filed, even after the filing of a notice of appeal to this court.