**Application of Allen G. EICKMEYER.**

**Appeal No. 79–525.**

United States Court of Customs and Patent Appeals.

July 19, 1979.

Warren N. Williams, John M. Collins, Kansas City, Mo. (Schmidt, Johnson, Hovey & Williams, Kansas City, Mo.), attorneys of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for Commissioner of Patents, Fred W. Sherling, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Associate Judges, and COWEN,[*] Senior Judge.

MILLER, Judge.

This is an appeal from the decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board"), rejecting claims 28, 31, 34–37, and 40.[1] We reverse.

## BACKGROUND

*The Invention*

Appellant's invention relates to a high temperature, catalyzed, absorption-desorption process for selectively removing acid gases (*e. g.*, carbon dioxide and hydrogen sulfide) from gaseous mixtures, as in the purification of natural gas and hydrogen streams employed for making ammonia. The absorption solution, which includes a potassium salt (*e.g.*, potassium carbonate) and a minor amount of an amine catalyst (*e.g.*, an alkanolamine or ethylene polyamine), is contacted at elevated temperatures with the gas stream to be purified.

The solution absorbs the objectionable acid gases and is then regenerated, for recycling in the continuous process, by steam stripping the acid gases from the absorption solution. Appellant allegedly discovered that use of the defined amines in conjunction with a carbonate absorption solution at elevated temperatures is precisely contrary to the predicted results[2] in that a highly catalyzed acid gas absorption solution results. Appellant's claims require "an elevated temperature of at least 56° C." during the absorption process. Claims 28 and 34 are typical:

28. An absorption-desorption process for removing acid gases such as $CO_2$ or $H_2S$ from gaseous mixture containing such acid gases, comprising the step of:

contacting said gaseous mixture with a hot aqueous solution comprising from about 15 to 40% by weight of a potassium salt selected from the group consisting of potassium carbonate, potassium borate and mixtures thereof and a minor amount of an amine selected from the group consisting of the alkanolamines and the ethylene polyamines in an absorption stage to thereby catalyze the absorption of said acid gases from said gaseous mixtures;

maintaining the aqueous solution at an elevated temperature of at least about 56° C. during contact with said gaseous mixture;

regenerating the hot aqueous solution containing said absorbed acid gas in a regeneration stage by steam stripping

[*] The Honorable Wilson Cowen, United States Court of Claims, sitting by designation.

1. Application serial No. 124,413 for "Method and Compositions for Removing Acid Gases from Gaseous Mixtures" was filed March 15, 1971, and is related through a divisional and a series of continuation-in-part applications to application serial No. 209,221, filed July 11, 1962.

2. In his brief, appellant summarizes the teachings of the prior art as follows:

[I]t was confidently predicted by those skilled in the art that the addition of minor amounts of the defined amines to a hot carbonate system would have had the effect of *increasing* the equilibrium back pressure of $CO_2$ within a gas stream to be purified, and that this would make absorption of $CO_2$ to residual levels extremely difficult. The prediction of increased equilibrium back pressure in the absorption solution stems from the known fact that both hot alkanolamine solutions and hot potassium carbonate solutions individually have relatively high equilibrium $CO_2$ back pressures, and that to combine two solution components having this characteristic should therefore yield a combined solution having an unacceptably high equilibrium $CO_2$ back pressure. This, of course, would predictably limit $CO_2$ absorption to an unacceptably low level.

at least a portion of said acid gas therefrom; and

recycling at least a portion of said regenerated solution for further contact with said gaseous mixture while maintaining said solution at a temperature of at least 56° C.

34. The process of Claim 28 wherein said aqueous solution is contacted with said gaseous mixture in a two-stage absorber.

*The Prior Art*

The examiner relied upon Mayland [3] for its disclosure of the use of specified amines (monoethanolamine, diethanolamine, and mixtures thereof) to catalyze a carbonate absorption process for removing carbon dioxide from gaseous mixtures. Regarding the operating temperature of the process, the Mayland specification states:

The rate of absorption and desorption of $CO_2$ in carbonate solutions is relatively slow. At ambient temperatures equipment so large as to be non-commercial would be required to provide sufficient time of contact. Operating at elevated temperatures in the 220° to 240° F. [104°–116° C] range [which is generally about the boiling point of the carbonate absorption solution in the regenerator], the rates are improved considerably but the equipment is still somewhat large for a given service compared to other competitive processes.

Nevertheless, none of the Mayland *claims* recites any qualitative or quantitative temperature limitation, the significance of which will later appear. Claim 1 is illustrative:

1. In a regenerative process for purifying gaseous mixtures by removing carbon dioxide therefrom, in which process the gaseous mixtures are brought into intimate contact with a solution of potassium carbonate whereby carbon dioxide is absorbed from said gaseous mixtures with the consequent conversion of potassium carbonate to potassium bicarbonate, the concentration of the said solution being equivalent to that of a water solution containing substantially 18% to substantially 40% of potassium carbonate, the step of maintaining in the solution a content of substantially 0.5% to 2% of an amine chosen from a group consisting of monoethanolamine and diethanolamine and mixtures thereof, whereby to increase the efficiency of the process.

Acting pursuant to 37 CFR 1.196(b), the board relied upon two further references: a British patent [4] and a U. S. patent to Benson.[5] The British patent discloses a carbonate absorption process, which is catalyzed by ethanolamine, for removing carbon dioxide from gas mixtures and is similar to the process disclosed in Mayland. Benson was cited for its teaching of a split-stream technique in an analogous gas purification process.

*Proceedings Below*

Concurrent with the filing of the application on appeal, appellant filed a notice under 37 CFR 1.205(b) with a supporting explanation and affidavits in order to provoke an interference with Mayland.[6] In the first

3. U.S. patent No. 3,144,301 to Bertrand J. Mayland for "Removal of Carbon Dioxide From Gaseous Mixtures," issued August 11, 1964, on application filed April 21, 1961.

4. British patent specification No. 1,084,526 to Homer E. Benson, Joseph H. Field, and William M. Epes for "Improvements in or relating to Gas Purification," published September 27, 1967.

5. U. S. patent No. 2,886,405 to Homer E. Benson and Joseph H. Field for "Method for Separating CO2 and H2S from Gas Mixtures," issued May 12, 1959, on application filed February 24, 1956.

6. Claims 26 and 27, the copied claims of Mayland as modified by appellant, read as follows:

26. In a regenerative process for purifying gaseous mixtures by removing carbon dioxide therefrom, in which process the gaseous mixtures are brought into intimate contact with a solution of potassium carbonate whereby carbon dioxide is absorbed from said gaseous mixtures with the consequent conversion of potassium carbonate to potassium bicarbonate, the concentration of the said solution being equivalent to that of a water solution containing substantially 15% to substantially 40% of potassium carbonate, the step of maintaining in the solution a con-

office action, the examiner refused to institute an interference, stating:

The limitation of 18–40% in the patent claim is not deemed an immaterial limitation. It is the broadest range disclosed in the patent specification. No basis is found in applicant's disclosure for the claimed amine concentration in a potassium carbonate solution. The affidavit showing of 2.3% amine in a 14.7% solution does not antedate the Mayland patent and no basis is perceived for institution of interference proceedings.

Thereafter, appellant amended his claims in response to numerous prior art rejections made by the examiner and submitted an affidavit under 37 CFR 1.131 (hereinafter "131 affidavit") to antedate the filing date of Mayland.

In the next office action, the examiner declared that the 131 affidavit of applicant "has been considered but may not be utilized to antedate the patent to Mayland as both applicant and Mayland are claiming substantially the same invention." The examiner did not contest the sufficiency of the 131 affidavit showing—only the applicability of the affidavit. During subsequent office actions, all rejections were withdrawn except that claims 28, 31, 34–37, and 40 were rejected as anticipated by Mayland under 35 U.S.C. § 102. The examiner adhered to his previous position, saying:

The claims of Mayland are of the Jepson type, however, and refer to a regenerative process of removing carbon dioxide from gases utilizing a carbon solution wherein the improvement is the maintaining [of, *sic*] the carbonate solution [with, *sic*] a specified amount of an amine. It is apparent that the process recited in the claims must operate at some temperature and recourse to the specification indicates that a regenerative process to which the claimed improvement is directed is operated at a temperature of 220–240° F, which embraces ap-

plicant's claimed temperature of "at least 56° C" (132° F).

He also said that because Mayland and applicant are claiming the same invention "the rejection can not [*sic*] be overcome by a Rule 131 Affidavit but only through interference proceedings."

*The Board's Decision*

The board interpreted the rejection before it as follows:

The examiner's rejection is based on 35 U.S.C. § 102(g); and, inasmuch as appellant has antedated the reference by an affidavit under 37 CFR 1.131 to the apparent satisfaction of the examiner, the examiner relies only on the patent claims as prior art.

The board agreed with the examiner's position regarding claims 28, 31, and 40, thus:

Even though only the claims of Mayland are prior art, they cannot be read in a vacuum. To give meaning to and determine the scope of the preamble of Mayland's Jepson type claims, it is necessary to look at the patent specification. In this case it is clear that appellant has merely recited the specific limitations of that part of the Mayland process which are intended to be encompassed by the preamble of the Jepson claims. That is to say, the Mayland claims are clearly drawn to a process which is carried out at the elevated temperatures recited in appellant's claims.

The board disagreed with the examiner on the other claims on the basis that Mayland does not disclose the "splitstream" technique of absorption and regeneration.

Pursuant to 37 C.F.R. 1.196(b) the board made several new rejections—all based upon its conclusion of lack of support, in the specification as filed and in the parent applications, for the limitation that the absorption process be carried out "at an elevated temperature of at least about 56° C."

---

tent of substantially 0.9% to 7.7% of an amine chosen from a group consisting of monoethanolamine and diethanolamine and mixtures thereof, whereby to increase the efficiency of the process.

27. The process of claim 26 wherein said amine content is maintained such that the atomic ratio of potassium to amino nitrogen is within the range of 2:1 to 100:1.

All claims on appeal were rejected under 35 U.S.C. §§ 132 and 112, first paragraph, as drawn to new matter or an invention that is not fully described in the specification as filed. The board reasoned:

> The temperature of 56° C is disclosed at page 8 of the specification merely as one temperature at which reaction kinetics of $CO_2$ absorption were measured. It is questionable whether in any event this disclosure would support the limitation "at least about 56° C." In this case, since the 56° C reactions concerned not the amines *per se,* but amine borates, this disclosure does not relate to the invention of the claims before us.

The board further rejected claims 28, 31, and 40 under 35 U.S.C. § 102(b) for anticipation by either Mayland or the British patent, finding the limitation ("at least about 56° C.") to be unsupported by the disclosure of the parent applications. It declared that Mayland and the British patents were statutory bars, which cannot be sworn behind by a 131 affidavit, and that, in addition to the British patent, the entire specification of Mayland is available as pri-

or art. Claims 34–37 were rejected under 35 U.S.C. § 103 based on the disclosure of either Mayland or the British patent, taken together with Benson, which discloses the split-stream technique "with a similar process except for the absence of the amine catalyst."

## OPINION

The purpose of filing a 131 affidavit[7] is to overcome the effective date of a reference[8] cited in support of a rejection. If the 131 affidavit demonstrates that the applicant's date of invention is earlier than the effective date of the reference, the reference is eliminated as support for the rejection.[9] The purpose of filing a 131 affidavit is *not* to demonstrate prior invention *per se,* but merely to antedate the effective date of the reference. *See In re Moore,* 444 F.2d 572, 58 CCPA 1340, 170 USPQ 260 (1971). Although the test for sufficiency of an affidavit under Rule 131(b) parallels that for determining priority of invention in an interference under 35 U.S.C. § 102(g), it does not follow that Rule 131 practice is

---

7. 37 CFR 1.131 ("Rule 131") provides:
§ 1.131 Affidavit or declaration of prior invention to overcome cited patent or publication.
(a) When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, or on reference to a foreign patent or to a printed publication, and the applicant shall make oath or declaration as to facts showing a completion of the invention in this country before the filing date of the application in which the domestic patent issued, or before the date of the foreign patent, or before the date of the printed publication, then the patent or publication cited shall not bar the grant of a patent to the applicant, unless the date of such patent or printed publication be more than one year prior to the date on which the application was filed in this country.
(b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from said date to a subsequent reduction to practice or to the filing of the application. Original exhibits of

drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence satisfactorily explained.

8. In the context of Rule 131, a reference "is nothing more than a patent or publication cited to show that all or part of the invention for which a patent is sought was in the prior art, either more than a year before the filing date to which the applicant is entitled, in which case it is a 'statutory bar' and cannot be sworn back of, or before the applicant's date of invention." *In re Stempel,* 241 F.2d 755, 760, 44 CCPA 820, 826, 113 USPQ 77, 81 (1957).

9. This is true whether the rejection is based on section 102 or section 103; the only difference is that when the rejection is based on section 103, "the purpose of an affidavit is to establish that the claimed invention was made by the applicant before the effective date of a reference relied upon to show that the invention was obvious," and "the applicant may prove, by eliminating a reference, that at the time the invention was made 'the subject matter as a whole would [not] have been obvious * * .'" *In re Tanczyn,* 347 F.2d 830, 832, 52 CCPA 1630, 1632–33, 146 USPQ 298, 300 (1965).

controlled by interference law.[10] To the contrary, "[t]he parallel to interference practice found in Rule 131(b) should be recognized as one of convenience rather than of necessity." 444 F.2d at 580, 58 CCPA at 1353, 170 USPQ at 267. Thus, "the 'conception' and 'reduction to practice' which must be established under the rule need not be the same as what is required in the 'interference' sense of those terms." *Id.; accord, In re Borkowski,* 505 F.2d 713, 718–19, 184 USPQ 29, 33 (Cust. & Pat.App.1974).

Rule 131 states that an affidavit can be used to antedate a U. S. patent reference "which substantially shows or describes but does not claim the rejected invention." The reason for not permitting such an affidavit where the U. S. patent reference claims the invention of rejected claims of an application is to compel the use of an interference to determine priority of invention.[11] Because 131 affidavit practice is designed to aid inventors in the protection of their statutory rights (*In re Stempel, supra,* note 8), we conclude that the phrase "does not claim the rejected invention" should be construed favorably to an applicant, if possible, so that unless the applicant is clearly claiming the same invention as the U. S. patent reference, he will not lose his rights under Rule 131. (As pointed out *infra,* the PTO can still declare an interference notwithstanding the filing of a 131 affidavit.)

Although 37 CFR 1.201(b) states that an "interference *will* be declared" (emphasis added) between applications and/or unexpired patents which "contain claims for substantially the same invention," understandably, administrative practice requires discretion by examiners and the Commissioner in determining whether an interference should be declared. That determination is based on their interpretation of whether the applications and/or patents involved claim "substantially the same invention." If such claims are identical and are fully supported and allowable, they generally will be put in interference. *But see* 37 CFR 1.201(c). An interference may also be declared when the applications and/or patents claim variations of the same invention. In such a case, the PTO may use phantom or modified counts as the basis for an interference. *See* 37 CFR 1.203(b); *cf. Squires v. Corbett,* 560 F.2d 424, 194 USPQ 513 (Cust. & Pat.App. 1977).

If it is determined that an applicant cannot use a 131 affidavit to antedate the effective date of a U. S. patent reference because it claims the subject matter of the rejected claim, there should be no question that his application and the reference application or patent "contain claims for substantially the same invention" and, thus, meet the test for instituting an interference. However, because the requirements of Rule 131 practice and interference practice are not the same, there may be occasions when the PTO determines that a 131

---

**10.** *See* Walterscheid, *Rule 131 Practice,* 57 J.Pat.Off.Soc'y 336 (1975).

**11.** As quoted above, the board characterized the examiner's rejection as based on 35 U.S.C. § 102(g) and apparently considered Mayland's claims to be prior art under that section. Although the statutory bar to use of a 131 affidavit, where the reference claims the rejected invention, is based on section 102(g), this does not make the claims of the reference "prior art" for purposes of that section. A section 102(g) rejection is based on a showing that "before the applicant's [date of] invention . . the invention was made in this country by another [Mayland] who had not abandoned, suppressed, or concealed it." (The first occurrence of the word "invention" does not refer to the *subject matter* of the claimed invention, but rather the *event* of invention—the act of producing or coming into possession of the subject

matter being claimed. *See* Janicke, "The Varied Meanings of 'Invention' in Patent Practice," 4 *Patent Law Perspective* (Appendix 1 1970); *cf. In re Moore,* 444 F.2d at 578, 58 CCPA at 1350, 170 USPQ at 266.)

To the extent that the PTO is attempting to rely upon an effective date of "prior invention" of Mayland before the filing date of the Mayland application, which is the effective date of Mayland under 35 U.S.C. § 102(e), we are not persuaded that the PTO has met its burden of establishing a prima facie case of *prior invention* under section 102(g). We have found nothing in the contents of the reference, the application on appeal, the statements in affidavits or declarations filed (including those under Rule 131), or the attorney's arguments during prosecution that establishes an earlier effective date.

affidavit can be used to antedate the effective date of a reference in order to overcome a rejection, but also determines that the involved application should be placed in interference with that reference. Such a seemingly anomalous result can be justified because: (1) the use of a 131 affidavit does not establish prior invention *per se,* and (2) the determinations ("claims the rejected invention" vs. "claims for substantially the same invention") are not coextensive. At the same time, we do not regard the opposite result (proposed here by the PTO) to be justifiable, namely: leaving an applicant in a position where he cannot overcome a reference by a 131 affidavit because the PTO has decided that the reference claims his invention, while, at the same time, he is denied an interference because the PTO has decided that the claims of his application and those of the reference are not for substantially the same invention.

█ In the case before us, appellant argues that the Mayland reference "does not claim the rejected invention" of his appealed claims because Mayland's claims do not contain any temperature limitation; whereas his claims require the operation of the absorption process "at an elevated temperature of at least about 56° C." Although the board recognized that Mayland's claims do not contain any temperature limitation, it concluded, as related above, that such a limitation can be read into the Mayland claims in order to "give meaning to and determine the scope of the preamble of Mayland's Jepson type claims." We would agree that Mayland *discloses* a temperature for the operation of a hot carbonate absorption system (104°–116° C), which is within appellant's claimed range ("at least 56° C."); nevertheless, Mayland did not *claim* a specific temperature range. Therefore, in light of our conclusion that the phrase "does not claim the rejected invention" should be construed favorably to an applicant, we are unwilling to read this additional limitation into the claims of the prior art reference.

This position is consistent with *In re Sutherland,* 347 F.2d 1009, 52 CCPA 1683, 146 USPQ 485 (1965), wherein this court, in reviewing a rejection for double patenting and, thus, determining whether Sutherland's (appellant's) application and a patent to Carpenter were claiming the same invention, concluded that the board acted improperly in reading matter disclosed in the specification into the Carpenter claims. Carpenter's specification *disclosed* the "surprising discovery that a latex *blend* prepared from frozen and thawed agglomerated synthetic rubber latex having a relatively large average particle size and synthetic rubber latex having a relatively small average particle size exhibited enhanced mechanical stability characteristics." 347 F.2d at 1010, 52 CCPA at 1686, 146 USPQ at 486. Carpenter *claimed* the freezing and blend characteristics. "Sutherland's invention was based on a discovery with respect to the *temperature* used in freezing the latex in the old freeze-thaw agglomeration process." 347 F.2d at 1011, 52 CCPA at 1686, 146 USPQ at 487. He *claimed* "subcooling the frozen latex to a temperature between about –10° F. and –40° F." The board held that Carpenter and Sutherland were claiming the same invention, saying (347 F.2d at 1014, 52 CCPA at 1690, 146 USPQ at 489):

> While the claims of Carpenter do not specify the temperature of freezing, the *disclosure of Carpenter shows such temperatures within the range appellant states as critical.* It is considered proper to look to the patent specification to determine the *scope of the term "freezing"* in the patent claims [citation omitted]
>
> . . . .

In criticizing the board's use of the Carpenter specification to determine the scope of his claims, this court said that the " 'scope' of the term 'freezing' in Carpenter's claims is not what we are concerned with but rather, *what invention* his claims *define."* 347 F.2d at 1014, 52 CCPA at 1690–91, 146 USPQ at 489.[12] Similarly, we conclude that

---

12. The court went even further than we need to go in the present case. The Carpenter claim

used the term "freezing," which is itself somewhat of a temperature limitation that might be

Mayland's claims do not define an invention including a temperature limitation. *Cf. In re Clark*, 457 F.2d 1004, 59 CCPA 924, 173 USPQ 359 (1972); *In re Hidy*, 303 F.2d 954, 49 CCPA 1152, 133 USPQ 650 (1962).

Accordingly, we hold that the effective date of the Mayland reference is antedated by appellant's 131 affidavit.

The rejection of claims 28, 31, and 40 under 35 U.S.C. § 102(g) is reversed.

With respect to the other rejections, the dispositive issue is whether there is support (satisfying the description requirement of section 112, first paragraph) in appellant's specification *and* in the parent applications for the claimed temperature limitation of "at least about 56° C." [13] As we read the board's opinion, there are two bases for its rejections: (1) that appellant has not disclosed any minimum temperature for the operation of the process, that is, he has not shown that 56° C is a minimum or critical lower limit for the operation of the process; and (2) that the reaction tests conducted at 56° C did not relate to amines in the generic sense but, instead, to amine borates.[14]

Regarding the first basis, the PTO has cited no precedent for requiring appellant to demonstrate that his process will not operate below 56° C. To satisfy the description requirement of section 112, first paragraph, an application must contain sufficient disclosure, expressly or inherently, to make it clear to one skilled in the art that the appellant was in possession of the subject matter claimed. *In re Mott*, 539 F.2d 1291, 190 USPQ 536 (Cust & Pat.App.1976);

*In re Smythe*, 480 F.2d 1376, 178 USPQ 279 (Cust. & Pat.App.1973). "[A] statement of appellant's invention [in his specification] which is as broad as appellant's broadest claims" is sufficient to meet this requirement. *In re Robbins*, 429 F.2d 452, 456, 57 CCPA 1321, 1325–26, 166 USPQ 552, 555 (1970). Appellant's specification indicates that hot potassium carbonate solutions are known in the prior art and contains replicate tests of the operation of his process at 56° C. Thus, that appellant considered his hot system to operate "at an elevated temperature of at least about 56° C." would have been clear to one skilled in the art from the replicate tests at 56° and 80° C and the teachings of the prior art that such systems were known to operate at temperatures above 80° C. Although appellant may be entitled to claim a range of temperatures below 56° C, he need not claim all that he is entitled to claim and need have support only for what he does claim. We are not persuaded that there is any requirement for appellant to demonstrate the *criticality* of a lower limit to meet the description requirement. And a review of the parent applications indicates that language corresponding to that in appellant's specification was also present in all of the parent applications relied upon for applicant's chain of priority.

Regarding the second basis, suffice it to say that the specification in several places equates amines and their borates as operable catalysts. Reading the specification as a whole, we agree with appellant's argu-

---

further defined by reference to the specification. There is no temperature limitation whatsoever in Mayland, neither a broad nor a specific term being used. Like Mayland, the Carpenter process had to be operated at some temperature (which was not only disclosed in the specification but also suggested by the term "freezing" in the claims); nevertheless, the court was unwilling to read that limitation into the claims.

13. If there is such support, the rejection under section 112, first paragraph falls; also, since such a rejection is tantamount to a new matter rejection under 35 U.S.C. § 132, that rejection must also fall. *In re Bowen*, 492 F.2d 859, 181 USPQ 48 (Cust. & Pat.App.1974). Moreover, if there is similar support in each of the parent

applications on which appellant relies in his chain of priority, appellant is entitled to the filing date of his original parent application, thereby eliminating Mayland and the British patent as references for the rejections under sections 102(b) and 103.

14. Because it was well known in the prior art that the process could be operated at temperatures greater than 80° C, appellant is claiming a process achieving the stated results at temperatures as high as known in the prior art. *See In re Goffe*, 542 F.2d 564, 191 USPQ 429 (Cust. & Pat.App.1976); *In re Geerdes*, 491 F.2d 1260, 1265, 180 USPQ 789, 793 (Cust. & Pat.App. 1974).

ment that the "only 'necessary and reasonable construction' would be that, inasmuch as the amines and amine borates are described as being equivalent for purposes of the invention as claimed, the characterizing temperatures given in the . . . amine borate examples are necessarily applicable to the amines as generically claimed." Again, corresponding disclosures are found in the parent applications.

In view of the foregoing, we hold that the limitation "at an elevated temperature of at least about 56° C." is fully described in appellant's specification and in the parent applications.

The rejections under sections 102(b), 103, 112, and 132 of claims 28, 31, 34–37, and 40 are *reversed*.

REVERSED

