**POLAROID CORPORATION**

v.

**EASTMAN KODAK COMPANY.**

Civ. A. No. 76–1634–Z.

United States District Court,
D. Massachusetts.

July 10, 1981.

Laurence S. Fordham, William J. Cheeseman, Foley, Hoag & Eliot, Boston, Mass. (William K. Kerr, Herbert F. Schwartz, Kenneth B. Herman, Edward F. Mullowney, New York City), for plaintiff.

John M. Hall, Choate, Hall & Stewart, Robert S. Frank, Jr., Boston, Mass. (Francis T. Carr, Kenneth E. Madsen, Michael J. Lennon, Kenyon & Kenyon, New York City), for defendant.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

In this action Polaroid Corporation ("Polaroid") contends that Eastman Kodak Company ("Kodak") has infringed twelve patents issued to Polaroid. All of the patents in suit relate to the process known as "instant photography". Kodak has denied infringement and has alleged that all of the patents are invalid or unenforceable. The case is before me on Kodak's motion for partial summary judgment with respect to Polaroid's U.S. Patent No. 3,761,269 ("269"). Kodak asserts that the '269 patent is invalid as a matter of law because it was issued in violation of the standards required for patentable invention set forth in 35 U.S.C. § 103.

### I. The Problem

The '269 patent, issued to Polaroid on September 25, 1973 on an application filed by Dr. John E. Campbell, concerns film units used in "instant" photography. One feature of instant photography is that the entire process of development takes place in the film unit itself. The film unit is composed of several photosensitive and print receiving layers encompassed within a light-tight container, and a pod containing processing fluid necessary to transform the negative into a finished positive. After the film has been exposed to light at the instant the picture is taken, the film unit is passed

between two rollers which rupture the pod and spread the processing fluid between the layers. Development of the finished photograph then takes place within the film unit.

To assure that the processing fluid is evenly distributed between the photosensitive layers it is necessary to provide excess processing fluid in the film unit. One of the problems presented to the inventors of this technology was the containment of this excess fluid within the unit itself. This was ultimately solved by providing a trapping mechanism located within the film unit designed to receive and hold the excess fluid.

The trapping mechanism includes a "spacer element" which has two features. It is made of a relatively incompressible material and has gaps or perforations within which the excess processing fluid is deposited and retained. As the film unit passes through the rollers the spacer element serves to force the rollers apart thus preventing them from squeezing liquid back out of the trap. The gaps or perforations accommodate all of the excess processing fluid.

Two possible problems are presented by the presence of excess processing fluid within the film unit itself. First, despite the gaps the excess processing liquid may flow back into the image-receiving area and damage the quality of the finished photograph, either while passing through the rollers, or in the case of integral film-units, while stored in the film unit after development has been completed. Second, since the processing liquid is highly alkaline in nature there is a potential safety danger to the hands and clothes of the user from leakage of excess processing fluid. These are the problems which the '269 patent was designed to solve.

## II. Scope of the '269 Patent

The "invention" of the '269 patent is twofold. The patent teaches, first, that by placing an acid in the trapping mechanism, the alkaline processing fluid will be neutralized and consequently rendered harmless. Second, the patent discloses that *the spacer element itself* can be coated or impregnated

with the acid necessary to neutralize the processing liquid if the element is formed of an absorbent, fibrous material. By permeating the spacer element with acid rather than placing it in the gaps formed for trapping the excess processing liquid, space which would have been taken up by the acid is available for trapping. Thus in combination the '269 patent discloses a trapping mechanism which neutralizes the excess processing fluid while providing greater trapping capacity by coating or impregnating a fibrous, absorbent spacer element with an acid.

The fact that this is the essential novelty upon which patentability was predicated is apparent from the form of the claim and the prosecution history. It is a basic proposition of patent law that the claims define the invention. *Great A & P Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Claim 1 of the '269 patent describes in the preamble the film unit itself and a compression resistant spacer element which serves to separate the rollers as the film unit passes between them. It also describes the multiplicity of gaps within the spacer element which provide trapping space for the excess processing liquid. The improvement clause then defines the alleged inventive contribution:

> The improvement wherein said spacer element includes an acid for neutralizing said processing liquid trapped in said spaces upon contact with said liquid.

Claim 1 is written in a form long known in the patent field as a "Jepson" claim. This type of claim stems from *Ex Parte Jepson*, 243 O.G. 525 (1917) in which a patent was granted for adding an improvement to an old and otherwise well known device. In approving that form of claim, the Assistant Commissioner stated:

> The whole apparatus upon which the applicant's invention is engrafted is not a part of his invention, and yet it must be considered and is as essential as the pedestal of a statue is essential to the statue, although it is no part of it. 243 O.G. at 257.

■ Thus in using the *Jepson* form the patentee relies upon that which follows the word "improvement" for his patentable claim. The preamble merely recites the prior art but forms no part of the inventor's patentable contribution. *Wells Mfg. Corp. v. Littlefuse, Inc.*, 547 F.2d 346 (7th Cir. 1976); *Delong Corp. v. Raymond Intern., Inc.*, 622 F.2d 1135 (3rd Cir. 1980); *Application of Sutherland*, 347 F.2d 1009 (C.C.P.A. 1965); *Application of Simmons*, 312 F.2d 821 (C.C.P.A.1963); *Application of Dinh-Nguyen*, 492 F.2d 856 (C.C.P.A.1974); *California Car Wash Systems, Inc. v. Danco, Inc.*, 348 F.Supp. 958 (D.Colo.1972).

■ In any improvement patent the preamble functions as necessary background enabling the reader to understand the milieu within which the invention is to operate and upon which it works an improvement. However, where as here the preamble is a mere description of the machine within which the improvement is to operate and is not necessary to give meaning to the claim it will not be read as a limitation on the claim. *Wells Mfg. Corp. v. Littlefuse, Inc.*, 547 F.2d 346 (7th Cir. 1976).

The prosecution history supports the conclusion that it was the improvement clause of the '269 patent alone upon which patentable novelty was predicated. As originally filed, claim 1 set forth as the "improvement" both the fibrous spacer element with a multiplicity of gaps and the placement of a neutralizing acid within that element. This claim was rejected by the Patent Examiner on the ground that a trapping mechanism including such a spacer element was well known in the art and could not form the basis for patentable invention. In response Polaroid amended its patent claim by moving the improvement clause so as to claim only the inclusion of the neutralizing acid within the spacer element as the alleged improvement. The patent attorney prosecuting the application filed a response along with the amendment stating:

In claim 1, the "improvement" part of the *Jepson*-style claim has been made more specific *in order to point out more clearly that which is old and that upon which patentable novelty is predicated.*

The present invention is directed to the disclosed film units including a spacer element or liquid trapping means, *which film units were known prior to the invention, the essence of the invention being the concept of including an acid in the spacer element to neutralize excess processing fluid.* [Emphasis supplied].

The claim was allowed as amended.

For the purpose of determining the question of obviousness then it is assumed that the scope of the '269 patent includes 1) the use of an acid to neutralize the excess processing fluid and 2) the inclusion of that acid within the spacer element itself. Those elements forming part of the preamble, namely, the film unit, the spacer element and the trapping means or "gaps" are prior art and are not within the scope of this patent. As such they form no part of the inquiry concerning obviousness.

## III. Obviousness

A patent will be declared invalid if it fails to meet the standard set forth in 35 U.S.C. § 103.[1] Pursuant to this section a patent is invalid if the alleged inventive contribution would have been obvious at the time the invention was made to one skilled in the art to which the patent pertains.

In the leading case of *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Supreme Court enunciated the factual inquiries that must be made in order to determine the legal issue of obviousness. The Court must determine 1) the scope and content of the

---

1. Section 103 of Title 35 states:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

prior art; 2) the differences between the prior art and the claims at issue; and 3) the level of ordinary skill in the pertinent art.[2]

### A. Scope and Content of the Prior Art

The Patent Examiner cited four patents as pertinent prior art.[3] Each patent cited by the Examiner discloses a trapping mechanism made up of a spacer element which is compressant resistant and serves to space apart the rollers as the film unit passes through them. In addition, each patent refers to a multiplicity of gaps for trapping the excess processing fluid. All four patents depict a comb-like spacer element with the space between the teeth of the comb serving as the trapping space for the deposit of excess processing fluid. Such an element was also included in the '269 patent as one of the design alternatives for the spacer element. One of the cited patents also discloses a variable volume trap which can adjust to the amount of excess processing composition present in the film unit.

Given this cited prior art the reasons for the Patent Examiner's rejection of the original formulation of claim 1 of the '269 patent are clear. The use of a comb-like compression resistant spacer element to trap excess processing fluid was well known in the art prior to the '269 patent application and could not form the basis for patentability.

None of the patents cited by the Examiner discloses the use of an acid to neutralize the excess processing liquid or the placement of such an acid within the spacer element itself. But Kodak points to two patents not cited which the parties agree do constitute prior art under the terms of 35 U.S.C. § 102.[4]

■ U.S. Patent Number 2,686,717 ("'717"), the first of the patents upon which Kodak relies, issued to Polaroid as assignee of the applicant Edwin H. Land, on August 17, 1954. The '717 patent specifications [5] describe a film unit like that described in the '269 patent composed of a series of superimposed layers including a photosensitive layer, a rupturable pod filled with an alkaline processing liquid and a trapping area. Included within the trapping area is a compression resistant spacer element.

The '717 patent discloses three alternative designs for this spacer element. Figure 1 depicts two narrow strips between which the trapping space is formed; Figure 5 depicts a comb-like element, like that depicted in '269 with the gaps between the teeth of the comb forming adequate space within which the excess processing fluid is deposited; and Figure 8 depicts a single *porous* trapping element made of heavy gauze within which the excess processing composition is absorbed.

The '717 patent recognizes the dual problems presented by the excess processing liquid—migration from the trapping area into the image-receiving area and safety to the user in the event of leakage. In order to solve these problems the '717 patent proposes the addition of an insolubilizing agent in the trapping area which by increasing the viscosity of the processing liquid renders it

2. The parties agree that the level of skill in the art of instant photography is very high and generally involves persons trained in the fields of chemistry or engineering.

3. The patents cited were: U.S. Patent Nos. 3,621,768 and 3,607,285 issued to Richard C. Chen; 3,652,282 issued to Edwin H. Land, and 3,652,281 issued to Albert J. Bachelder and Frederick J. Binda, all of which are assigned to Polaroid Corporation.

4. 35 U.S.C. §§ 102(a) and (b) provide:
   "A person shall be entitled to a patent unless—
   (a) the invention was known or used by others in this country or patented or described in a printed publication in this or a foreign country,

before the invention thereof by the applicant for patent, or
   (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

5. While it is the claims which define the scope of the patent monopoly, in construing a patent the Court may look to the specifications and drawings with a view to ascertaining the invention. *Philip v. Mayer, Rothkopf Industries*, 635 F.2d 1056 (2d Cir. 1980).

immobile. The patent states that an acid may be used for this purpose which will have the added benefit of neutralizing the alkaline liquid and lowering the pH. The '717 patent states:

> To insolubilize these materials an acid, such as maleic acid, ... may be incorporated in the trapping area to neutralize the alkali in the liquid and lower the PH below 7, thereby rendering these film-forming materials relatively insoluble.

The '717 patent goes on to suggest that when using the porous spacer element disclosed in Figure 8 *the insolubilizing agent may be included within the spacer element itself* by dipping the element into the agent:

> When a porous material is additionally included in the trapping portion it may be dipped in a bath of the insolubilizing reagent before being applied to the film construction...

Thus the '717 patent teaches that if an acid is incorporated into the spacer element itself it will have the effect of both neutralizing and insolubilizing the excess processing liquid.

The other patent upon which Kodak relies in this motion is U.S. Patent Number 1,026,096 ("096") issued to Polaroid on April 14, 1966. The trap of the '096 patent operates in the following manner: prior to exposure the porous spacer element is contained on two separate sheets constituting the positive and negative film elements respectively, which are hinged together in the middle. Upon exposure the sheets are brought together when the film unit is passed through the camera rollers and a single porous trapping element is formed. The trap then operates in the usual fashion to trap and neutralize the excess processing fluid.

The '096 patent recognizes the need to trap and retain the highly caustic excess processing liquid "in order to prevent its undesired escape from the lamination within and/or without the camera apparatus."

To solve this problem the '096 patent proposes the use of a spacer element composed of a permeable absorbent material containing an acid. Such a spacer element, the patent suggests would be adapted to neutralize the excess processing composition upon contact:

> It has now been discovered that the aforementioned problems presented by caustic processing composition overrun, may be prevented by trapping means which comprise a permeable acid-containing layer ... adapted to trap or retain and neutralize liquid processing composition upon contact...

The specific acids suggested for use in the trap by the '096 patent are precisely those suggested by the '269 patent in suit.[6]

### B. The Difference Between the Prior Art and the '269 Claims

■ It is a settled proposition of patent law that issued patents are presumed valid. 35 U.S.C. § 282. Such a presumption is rebuttable however and merely shifts the burden of proof to the party attacking the validity of the patent. *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660 (7th Cir. 1980). Where it is shown by the party attacking the validity of the patent that relevant prior art was not considered by the Patent Office the presumption of validity is dissipated. *Futorian Mfg. Corp. v. Dual Mfg. & Engineering*, 528 F.2d 941 (1st Cir. 1976).

Kodak asserts that since neither '096 nor '717 were cited by the Patent Examiner no presumption of validity can attach to the '269 patent for these purposes. Polaroid disputes this contention asserting that two of the three Examiners cited the '717 patent in earlier patent applications and that the '717 patent was in the class searched by the Patent Examiner in the '269 patent application. Hence Polaroid contends that this Court must presume that the uncited prior art was known to the Patent Examiner and cast aside as less pertinent than the art cited.

---

**6.** These acids include: ascorbic, sulfamic, oxalic, maleic, succinic, boric, malonic, tartaric and fumaric acid.

For the purposes of this motion I will assume that, at least as to the '717 patent, the Patent Examiner knew of the prior art. Such an assumption merely operates to maintain the burden of proof upon Kodak and is not dispositive of the issue. A finding of invalidity may still be warranted where Kodak meets its burden of proof.

The issue thus becomes whether, in light of the '717 patent and the '096 patent, the solution posited by the '269 patent was obvious within the meaning of 35 U.S.C. § 103. I conclude that it was.

█ It is clear from a reading of the '717 and the '096 patents as well as the patents cited by the Examiner that the problems of migration and safety posed by the presence of excess processing fluid within the film unit itself were recognized long prior to the introduction of the '269 patent. The solution posed by both '717 and '096, namely, to incorporate an acid into a porous spacer element thus effecting a neutralization of the fluid is identical to that postulated in '269. Given the presence of '717 and '096 such a solution would have been obvious to one skilled in the art at the time the "invention" was made.[7]

It is immaterial, despite Polaroid's arguments to the contrary, that the '269 patent is directed to an integral film unit while '096 and '717 relate to "peel-apart" film units. It is true that the problem of migration exists for a longer period of time in an integral film unit than in the peel-apart variety, since in the latter the trapping area is located in the paper which is ultimately discarded by the user while in the former the excess processing liquid remains within the trap for the life of the photograph. However, the problem itself remains the same—to contain the liquid and to neutralize it. The '269 patent solves that problem in the same manner as do the two prior art patents.

Polaroid also contends that the "invention" of the '269 patent could not have been obvious to one skilled in the art at the time of the invention from '717 because the '717 patent is primarily concerned with insolubilizing the excess processing liquid rather than with neutralizing it. While it is true that the insolubilization reaction is the primary teaching of the '717 patent, that patent also teaches that a neutralization reaction will occur if the insolubilizing agent used is an acid. In view of this teaching it was clearly obvious to incorporate it in exactly the same manner into a patent solely concerned with neutralization. Such a step is not the type of "advance" upon which patentable monopolies were intended to be predicated.

Insofar as Polaroid contends that the *trap design*, particularly that of the spacer element, differs in '269 from that revealed in '096 and '717, these contentions are immaterial to the present motion since the trap design forms no part of the patentable invention disclosed in '269 and was clearly disclosed in the prior art cited by the Patent Examiner.

█ Finally, Polaroid argues vociferously that Kodak's long-felt need for the trap design embodied in the '269 patent and Polaroid's commercial success with the trap negates the contention of obviousness. While such factors may be relevant to an inquiry on the question of obviousness, commercial success without invention will not make for patentability. *Great Atlantic &*

---

7. Even if I were not to hold here that the alleged invention of the '269 patent was an obvious development in light of the prior '096 and '717 patents, a finding of invalidity is not precluded. Certainly the neutralizing capabilities of acids were well known to anyone working in the art of chemistry long before 1973. Hence the use of an acid in the trapping mechanism to accomplish a neutralization reaction was merely an adaption of a known process to a new use. Such an adaption, while requiring ingenuity, was not more than could be expected by a mechanic skilled in the art. *See, Mandel Bros. v. Wallace*, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12 (1948). As for the inclusion of the acid within the spacer element itself, such a change in form, proportion or degree is a solution which one might expect from the ordinary skilled mechanic and may not rise to the dignity of invention. *Fowler v. Sponge Products Corp.*, 246 F.2d 223 (1st Cir. 1957). In view of today's holding however, I need not reach this question.

388

*Pacific Tea Company v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The fact that any new device is successful in the marketplace is an indication that it is a good idea and serves a useful function, but scores of good ideas do not rise to the level of invention necessary for patentability.

■ This case is an appropriate one for partial summary judgment. Although summary judgment is not generally favored in patent cases, in this Circuit summary judgment will be granted where "the patent in suit and the prior art are readily understandable by the lay mind without any more expert aid than that afforded by the depositions and affidavits of record." *American Tube & Controls, Inc. v. General Fittings Co.*, 407 F.2d 1291, 1293 (1st Cir. 1969). This is just such a case. There are no complex principles of chemistry or engineering necessary to understand the basic problem of liquid containment involved here and the neutralization solution provided by including an acid within a porous spacer element. The fact that this solution had the additional benefit of freeing up additional space for trapping thus increasing trapping capacity is a mechanical concept readily understandable by a lay mind. This Court has no need for expert affidavits or testimony to decide the issue of obviousness involved here.[8]

In conclusion I find that the alleged invention of the '269 patent would have been obvious to one skilled in the art at the time the invention was made, and that the patent is, therefore, invalid.

Accordingly, Kodak's motion for partial summary judgment is allowed in accordance with this opinion.

---

8. Polaroid's submission of the affidavit of John E. Campbell, the "inventor" of the '269 patent in suit, in which he states that the invention would not have been obvious to one skilled in the art at the time of the invention is not conclusive since this is the ultimate legal issue to be decided and is reserved for the Court. *Dual Mfg. & Engineering v. Burris Industries, Inc.*, 619 F.2d 660 (7th Cir. 1980).